1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    R.W.,                                    Case No.  25-cv-02302-EMC

8                    Plaintiff,

9            v.                               **ORDER**

10   COMMISSIONER OF SOCIAL                    Docket Nos. 15, 17, 18
     SECURITY,
11
                    Defendant.
12

13

14          Plaintiff R.W. seeks review of the Commissioner's final decision denying his Title II

15   application for disability insurance benefits and his Title XVI application for supplemental

16   security income ("SSI").  R.W. has exhausted his administrative remedies with respect to his claim

17   of disability.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  R.W. asks that the final

18   decision be reversed and the case remanded for additional administrative proceedings.  Having

19   considered the parties' briefs and the administrative record, the Court hereby **DENIES** R.W.'s

20   request for relief.

21          **I.        FACTUAL & PROCEDURAL BACKGROUND**

22          On June 4, 2020, R.W. filed a Title II application for disability insurance benefits and a

23   Title XVI application for SSI.  *See* AR 378, 385 (applications).  He claimed a disability onset date

24   of December 2, 2012.  The disabilities initially asserted were physical impairments: high blood

25   pressure and back problems.  *See* AR 422 (Disability Report Adult).  Medical records later

26   submitted also indicated mental impairments, including a learning/development disability and

27   schizoaffective and bipolar disorders.

28          For example, in 2017, Dr. Jennings, one of R.W.'s main treating providers, diagnosed

United States District Court
Northern District of California

1  R.W. with a developmental disability, following a report by R.W. that he had been in special

2  education during his school-age years.  *See* AR 684 (medical records from Dr. Jennings, dated

3  June 2017) (noting that "[a] friend who is with the patient brings out disability paperwork for SSI

4  relating to this patient's history of low level education with going through early school and high

5  school on special education[;] turns out he has some developmental disability issues it appears");

6  *see also* AR 75 (R.W. testifying during first ALJ hearing that he was in special education classes

7  during school).  Dr. Jennings later characterized that learning/developmental disability as mild.

8  *See, e.g.*, AR 784 (medical records from Dr. Jennings, dated November 2021) (noting "[m]ild

9  cognitive impairment developmental disability"); *see also* AR 718 (social worker's assessment,

10  dated March 2018) (noting "[m]ild development[a]l impairment (learning disability)").

11      In 2018, R.W. reported to a social worker that he was having "intrusive thoughts" and

12  "paranoia"; the social worker assessed "mild to moder[a]te depression and anxiety as a result of

13  life stressors."  AR 711, 718 (social worker's assessment, dated March 2018).  Approximately two

14  years later, in 2020, R.W. was referred to a psychiatrist, Dr. Anderson.  R.W. reported to Dr.

15  Anderson that he had been hearing voices for the past three years.  *See* AR 654 (medical records

16  from Dr. Anderson, dated April 2020).  Dr. Anderson found that R.W.'s thinking was "frequently

17  illogical" and his insight/judgment was "impaired."  AR 654.  He diagnosed R.W. with a

18  schizoaffective disorder and depression.  *See* AR 654.  R.W. was prescribed Abilify/aripiprazole,

19  an antipsychotic medication, *see* AR 655, but, on a return visit to Dr. Anderson several months

20  later, R.W. reported that he had stopped taking the medication because it caused him bad

21  headaches.  He also reported that he "occasionally" heard voices but "no specific delusions [were]

22  identified."  AR 652 (medical records from Dr. Anderson, dated July 2020).  Dr. Anderson noted

23  that R.W. was "somewhat improved," did not issue any further prescription, and informed R.W.

24  that he could get treatment from the clinic "in the future if needed."  AR 652.

25      It appears that R.W. did not seek mental health treatment again until two years later, when

26  he began to see Dr. Friedman, another psychiatrist.  R.W. reported that he sometimes heard voices.

27  Dr. Friedman noted that no delusional content was expressed, that R.W.'s memory and cognition

28  were intact, and that his judgment and insight were fair.  *See, e.g.*, AR 852 (medical records from

Dr. Friedman, dated August 2022).   She prescribed Wellbutrin for anxiety and depression, *see* AR 853, but R.W. stopped taking the medication shortly thereafter as it did not appear to help and seemed to contribute to irritability.   Subsequently, Dr. Friedman diagnosed bipolar 2 disorder and prescribed Latuda, another antipsychotic medication.   *See* AR 855 (medical records from Dr. Friedman, dated September 2022).   R.W. stopped seeing Dr. Friedman by late 2022.

R.W. later sought treatment from a physician's assistant, Mr. Pickett, who also diagnosed bipolar 2 disorder.   R.W. declined a behavioral health referral, and several months later Mr. Pickett noted that the disorder was stable.   *See* AR 836, 839 (medical records from Mr. Pickett, dated March 2023 and June 2023).During proceedings before the Social Security Administration, an ALJ found that R.W. was not physically or mentally disabled and therefore not entitled to relief.   The ALJ employed the five-step sequential process to determine whether R.W. was disabled.   *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   Under that process, if an ALJ finds that the claimant is disabled at a given step, then the ALJ need not proceed to the next step.   If the ALJ cannot determine whether the claimant is disabled, the ALJ will continue to the next step.

A.    First ALJ Decision

The ALJ initially held a hearing on R.W.'s claims in March 2022.   *See* AR 166 (ALJ decision).   In May 2022, the ALJ issued her decision denying benefits.

First, the ALJ dismissed the Title II claim for disability insurance benefits because R.W. had voluntarily withdrawn it.   R.W. had amended his alleged disability onset date to June 3, 2020 (*i.e.*, the date he applied for benefits).   But his date last insured was years earlier – March 31, 2014.   Accordingly, disability insurance benefits could not be awarded.   *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (explaining that, for disability insurance benefits, "a claimant is eligible . . . where she demonstrates disability *on or before the last date for which she were insured*") (emphasis added).

As for the Title XVI claim, the ALJ engaged in the five-step sequential process.   At step one, she determined that R.W. had not engaged in substantial gainful activity since June 3, 2020, the amended disability onset date (as asserted by R.W.).   *See* AR 169 (ALJ decision).   At step two, she found that R.W. had the following severe impairments: depression, lumbago, and

hypertension.  *See* AR 169.  At step three, she concluded that R.W. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (physical or mental) in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* AR 169.  At step four, she found that R.W. had the residual functional capacity ("RFC") to perform medium work but with certain exceptions: "the claimant can perform simple, routine tasks equivalent to unskilled work with a maximum SVP of 2[,] [and] [t]he claimant can have less than occasional interactions with the general public and coworkers."  AR 171.  Based on this RFC assessment, the ALJ held that R.W. was capable of performing past relevant work as an auto detailer.  *See* AR 174.  Alternatively, the ALJ held that, at step five, there were other jobs that existed in significant numbers in the national economy that R.W. could perform considering his age, education, work experience, and RFC.  *See* AR 174.

R.W. appealed the ALJ's decision to the Appeals Council, which granted review.  The Appeals Council vacated the ALJ decision, identifying several issues:

- First, the ALJ's RFC assessment used "nonspecific qualifying terms in describing the claimant's limitations. . . . The RFC assessment include[d] a restriction to 'less than occasional' interactions with the public and coworkers [but] does not define the term 'less than occasional.'  The RFC assessment is the most a claimant can do, not the least.  Further consideration should be given to the claimant's *maximum* mental RFC."  AR 185 (Appeals Council decision) (emphasis added).

- Second, the ALJ's decision did not "contain an adequate evaluation of opinion evidence in assessing the claimant's RFC. . . . [B]oth State agency psychological consultants opined that the claimant is limited to brief and superficial contact with supervisors, coworkers, and the public.  But, the decision does not explain why such limitations were not warranted. . . . [T]he RFC assessment contains no limitations pertaining to the claimant's ability to interact with *supervisors*."  AR 186 (emphasis added).

- Third, the record was not clear.  Although the state agency psychological consultants referred to a consultative *psychological* examination that took place on

April 10, 2021, the record did not contain a consultative psychological examiner report. "The record does contain a report from an *internal medical* consultative examiner dated April 10, 2021. On remand, an [ALJ] should ensure that the record is *complete* in this regard." AR 186 (emphasis added).

The Appeals Council then directed the ALJ to do the following on remand:

- Obtain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence. The additional evidence may include, if warranted and available, a consultative examination and medical source opinions about what the claimant can still do despite the impairments.

- Give further consideration to the claimant's maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations. In so doing, evaluate the medical source opinions and prior administrative medical findings pursuant to the provisions of 20 CFR 404.1520c and 416.920c. As appropriate, the [ALJ] may request the medical sources to provide additional evidence and/or further clarification of the opinions.

AR 186.

B.    Second ALJ Decision

On remand, the ALJ held a second hearing in September 2023. *See* AR 17 (ALJ decision). In March 2024, she issued a decision which again denied benefits.

Before conducting the five-step sequential process, the ALJ addressed two preliminary matters. First, she addressed the alleged disability onset date. She noted that R.W. had first claimed December 2, 2012, as the onset date and then amended it. But in post-remand filings and proceedings, R.W. appeared to revert to the first date – and to reassert a Title II claim. The ALJ therefore proceeded with the understanding that R.W. was asserting both Title II and Title XVI claims based on the original asserted onset date of December 2, 2012. *See* AR 17-18.

Second, the ALJ addressed the Appeals Council's directive to ensure that the record was complete – *i.e.*, to ensure that a report from a consultative psychological examination was included as part of the record. She noted as follows:

///

United States District Court
Northern District of California

> [T]he Appeals Council indicated that "the state agency consultants reference a psychological consultative examination [as] completed on April 10, 2021," and added that "the medical evidence of record does not contain a psychological consultative examiner report. The record does contain a report from an internal medical consultative examiner dated April 10, 2021. . . ." There are in fact two pages in evidence that variously suggest (on their face) that a consultative psychological evaluation had been ordered from (and billed by) "Tania Shertock, Ph.D" and that Dr. Shertock had thereafter "produced a consultative examination report." After careful review of the electronic record (including all exhibited and non-exhibited documents), however, the undersigned concludes that no consultative psychological examination was ever conducted in his matter, whether on April 10, 2021 or otherwise. Instead, the claimant was presented for a consultative internal medicine evaluation by Rose Lewis, M.D., on April 10, 2021. Thereafter on May 17, 2021, a state agency disability examiner reported having contact[ed] the claimant to ask about "his developmental delay or any mental health issues" and added that the claimant "said he has been diagnosed with some in the past but doesn't really think he has a problem." The examiner then indicated, "I asked if he would like to attend a mental consultative evaluation and [the claimant] said absolutely not as he does not feel he has a real psych[ological] issue."

AR 18.

The ALJ recognized that R.W. had, shortly before the hearing, asked to postpone proceedings so that a consultative psychological examination could be conducted "'as ordered by the Appeals Council.'" AR 19. But, the ALJ noted, the Appeals Council did not order such an examination. The ALJ further noted that, although she had previously agreed to order such an examination, that was based on her belief that a consultative psychological examination had taken place in April 2021 but simply was not exhibited or considered. "[W]hen it later became clear" that the state agency consultants had erred in referring to such an examination, that "changed the [ALJ's] perspective and position regarding the need for any consultative psychological evaluation." AR 19.

The ALJ ultimately determined that there was no need to order a consultative psychological examination. R.W. had provided testimony about his mental impairments at the hearing, and the record contained medical records and/or opinions related to R.W.'s mental impairments, *see* AR 18-20, including from a psychiatrist in 2020, *see, e.g.*, AR 652-55 (Dr. Anderson), another psychiatrist in 2022, *see, e.g.*, AR 851-52 (Dr. Friedman), and a physician's

assistant (PA) in 2023.  *See, e.g.*, AR 906-11 (Mr. Pickett).  The ALJ thus concluded that there was sufficient evidence in the record to evaluate R.W.'s "alleged history of learning disorder/unspecified developmental disorder and his mental [RFC]."  AR 20 (ALJ decision).

Having addressed the above preliminary matters, the ALJ turned to the five-step sequential process.  At step one, she found that R.W. had not engaged in any substantial gainful activity since the claimed disability onset date of December 2, 2012.  *See* AR 22.

At step two, the ALJ essentially separated out the Title II and Title XVI claims.

- For Title II disability insurance benefits, R.W. had to establish a disability on or before his date last insured, which was March 31, 2014.  The ALJ noted that there were "no medical records constituting direct evidence of any mental or physical evaluations [or] examinations of the claimant for any relevant time period through the Title II date last insured, or indeed for any prior time period prior [to] his earliest documented clinical examination (for physical symptoms only) conducted on May 31, 2017."  AR 22-23.  The ALJ thus found that R.W. "had no medically determinable mental or physical impairments through the Title II date last insured."  AR 23; *see also* SSR 16-3p (noting that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability"); 20 C.F.R. § 404.1529 (providing that "statements about your pain or other symptoms will not alone establish that you are disabled").  However, recognizing that, in years after the date last insured, R.W. had been diagnosed with a learning disorder or an unspecified developmental disorder, the ALJ also made an alternative finding: to wit, "any history of learning disorder or unspecified developmental disorder was non-severe through the Title II date last insured."[1]  AR 23.

---

[1] In his papers, R.W. argues that there was insufficient evidence for the ALJ to come up with a RFC with respect to his Title II claim.  *See* Op. Br. at 28.  But the ALJ did not need to make an RFC assessment for the Title II claim because she disposed of the Title II claim at step two, and thus did not reach, *inter alia*, steps four and five where RFC becomes an issue.

- For the Title XVI claim SSI, the ALJ determined that, since the application filing date (June 2020), R.W. had several severe impairments: "lumbar degenerative disc disease; anxiety disorder; bipolar disorder; depressive disorder; schizoaffective disorder; and (in combination with those other severe mental impairments) a history of learning disorder." AR 23. The ALJ recognized that R.W. had other medical issues – including hypertension, Type II diabetes, bilateral cataracts, and obesity – but found that these conditions "no more than minimally impaired [R.W.'s] ability to perform work" and thus the impairments were not severe. AR 23-24. The ALJ added, however, that any impairments related to such conditions would still be considered in the remaining steps (*i.e.*, as they could affect R.W.'s RFC).

Because step two for the Title II claim resulted in a finding of no disability, the ALJ continued the five-step sequential process for the Title XVI claim only.

At step three (for the Title XVI claim), the ALJ determined that R.W. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations. *See* AR 25. The ALJ considered both physical as well as mental impairments. *See* AR 26-29.

At step four, the ALJ found that, "since the claim application filing date [June 2020], the claimant has the [RFC] to perform medium work . . . except that: the claimant is limited to performing simple work; and the claimant is limited to no more than occasional interaction with the general public, coworkers, and supervisors." AR 29. Accordingly, she concluded that R.W. could perform his past relevant work as an automobile detailer. *See* AR 43. As an alternative holding, the ALJ stated, at step five, that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering [his] age, education, work experience, and [RFC]." AR 43-44. The ALJ pointed to both jobs with medium exertional level and jobs with light exertional level. *See* AR 44-45.

The Appeals Council affirmed the ALJ's finding of no disability, both for the Title II and Title XVI claims. *See* AR 1-3 (Appeals Council decision). R.W. subsequently initiated this

1    lawsuit in federal court.

2                                    **II.    <u>DISCUSSION</u>**

3    A.    <u>Legal Standard</u>

4            After a final decision on a claim of disability has issued, the claimant may seek judicial

5    review of that decision by a district court.  *See* 42 U.S.C. § 405(g).  The Commissioner's decision

6    will be disturbed only if the ALJ committed legal error or if the ALJ's findings are not supported

7    by substantial evidence.  *See Obrien v. Bisignano*, 142 F.4th 687, 693 (9th Cir. 2025).

8            "Substantial evidence" is a legal term of art.  It "means only[] such relevant evidence as a

9    reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks

10   omitted).  In conducting its review, a court evaluates "the record as a whole, . . . weighing both the

11   evidence that supports and detracts from the ALJ's conclusion" to determine if substantial

12   evidence supports a finding.  *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001).  If the

13   evidence supports "more than one rational interpretation," a court must uphold the ALJ's decision.

14   *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005).

15   B.    <u>Duty to Develop Record</u>

16           R.W. argues first that he is entitled to a remand because the ALJ failed to properly develop

17   the record to evaluate his claims.

18           "Social Security proceedings are inquisitorial rather than adversarial," and therefore an

19   ALJ has a "duty to investigate the facts and develop the arguments both for and against granting

20   benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  The ALJ has this duty even when a

21   claimant is represented by counsel.  *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003).

22   The ALJ's duty to develop the record, however, is triggered only in certain circumstances: "[1]

23   when there is ambiguous evidence or [2] when the record is inadequate to allow for proper

24   evaluation of the evidence."  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).

25           In his motion for relief, R.W. argues that the ALJ erred because she failed to develop the

26   record in two ways: (1) the ALJ failed to obtain information about his medical condition prior to

27   March 31, 2014, and (2) the ALJ failed to order a consultative psychological evaluation.

28

United States District Court
Northern District of California

1.      Medical Condition Prior to March 31, 2014

According to R.W., the ALJ should not have rejected his Title II claim for disability insurance benefits because there was an insufficient record as to what his medical condition was on or before March 31, 2014 (his date last insured). He maintains that the ALJ failed in her duty to develop the record to assess his Title II claim.

R.W.'s argument lacks merit. The record reflects that efforts were made to get medical records prior to 2017, but apparently R.W. did not provide names or addresses for any providers. *See, e.g.*, AR 531 (Disability Determination Services, Case Activities) ("Activity Date: 09/04/2020 . . . . Misc - Call-in /F6 insert - Claimant Call In Letter w/F6 Instructions[.] Clmnt Requested to call analyst/Due Process Given[.] THE ADVENTIST HEALTH RECORDS ONLY GO BACK TO 2017. IF YOU HAVE ANY OTHER TREATING SOURCES PRIOR TO 2017, PLEASE CALL AND ADVISE SO WE CAN OBTAIN TH[E]SE RECORDS."); AR 92 (Title II Initial Disability Determination Explanation) ("2020/09/18: rcvd call from clmnt & he said he has seen some doctors prior to 2017 but he doesn't have names or addresses. He needs to look them up & will call back.").

To the extent R.W. suggests that the ALJ should have ordered a consultative examination "to give retroactive opinions," Op. Br. at 16, he has failed to explain how a retroactive opinion could realistically have been given. There were no medical records from before 2017 for an examiner to consider, and, even if an evaluation of his current condition (in 2023 or 2024) could have been provided to the ALJ as part of the post-remand proceedings, it would likely shed little, if any, light on what his condition was more a decade earlier. *See Salazar v. Barnhart*, 180 Fed. Appx. 39, 50 (10th Cir. 2006) ("find[ing] it difficult to imagine that any medical or psychological professional would be able to prepare a retrospective analysis of Ms. Salazar's mental impairments" five years earlier); *Leach v. Kijakazi*, No. 4:21-CV-1331 PLC, 2023 U.S. Dist. LEXIS 55000, *31 n.14 (E.D. Mo. Mar. 30, 2023) (stating that "remand for further development of the record would likely be futile" because "[t]he relevant three-month time period in this case . . . is now almost 15 years in the past[;] [n]othing in the record suggests that recontacting Plaintiff's treating sources or the retroactive analysis of Plaintiff's physical impairments via the completion

United States District Court
Northern District of California

United States District Court
Northern District of California

of a consultative exam would be practical or fruitful"); *Almodovar v. Astrue*, No. CV-11-9227-SP, 2012 U.S. Dist. LEXIS 125283, *28-30 (C.D. Cal. Aug. 31, 2012) (stating that "a consultative examiner would have been of no assistance because a present-day examination would not be able to shed any light on plaintiff's condition and RFC prior to the DLI"; "the medical records for the relevant period consists of a mere seven pages," and so "a consultative examiner would not have been able to offer a supported opinion of plaintiff's pre-DLI limitations" and instead "would only have been able to opine on plaintiff's current condition, which was not in dispute").

2.    Consultative Psychological Examination

R.W. argues next that the ALJ failed to properly develop the record because she did not order a "full" consultative psychological examination – one that would address the disability onset date and cover not only learning disorders but also his "medically diagnosed anxiety disorder, bipolar disorder, depressive disorder[,] and schizoaffective disorder."  Op. Br. at 17.  The Court finds no error here as well.  Similar to above, a consultative examiner would likely be unable to provide competent evidence with respect to the alleged onset date of December 2, 2012.

Furthermore, as noted above, the duty to develop the record is triggered only if there is ambiguous evidence or the record is inadequate to allow for proper evaluation.  *See McLeod*, 640 F.3d at 885; *see also Castle v. Colvin*, 557 F. App'x 849, 853 (11th Cir. 2014) (noting that an ALJ is "not required to order a consultative examination as long as the record contains sufficient evidence for the ALJ to make an informed decision").  The record was adequate for the ALJ to assess R.W.'s mental condition.  *See Wellington v. Berryhill*, 878 F.3d 867, 874 (9th Cir. 2017) (indicating that an "ALJ's duty to develop the record is discharged" when, "despite some inadequacies, 'a relatively complete medical chronology' of the claimant's condition during the relevant time period is available").  As the ALJ noted, the record contained medical records and/or opinions related to mental impairments, *see* AR 18-20, including from one of R.W.'s main treating providers (Dr. Jennings), *see* AR 772-74; a psychiatrist who evaluated R.W. in mid-2020 (Dr. Anderson), *see* AR 652-55; another psychiatrist who treated R.W. for several months in late 2022 (Dr. Friedman), *see* AR 851-62; and a physician's assistant (PA) who treated R.W. in early to mid-2023 (Mr. Pickett).  *See* AR 838-40; AR 835-86; AR 906-11.

1    The ALJ's decision is not inconsistent with the Appeals Council decision. The Appeals

2    Council did not order a mental examination; it simply said that the ALJ could obtain, "if warranted

3    and available, a consultative examination." AR 186 (Appeals Council decision). The Appeals

4    Council's concern was that the record did not seem to be complete because a state agency

5    consultant had referred to a psychological consultative exam with a specific date but the record did

6    not contain that report. The ALJ determined  that the state agency consultant had made an error –

7    *i.e.*, the report was actually an internal medicine consultative exam. The absence of a

8    psychological consultative exam did not render the medical record incomplete in view of the

9    medical records available to and reviewed by the ALJ.

10   Nor has R.W. shown how the evidence was ambiguous with respect to his mental

11   condition. For example, R.W. has not contended that there was something "unclear or ambiguous

12   about what [the above providers who treated his mental condition] said."[2]  *McLeod*, 640 F.3d at

13   844. In addition, the medical records regarding his learning/developmental disability were

14   consistent, with the disability being characterized as mild. As for the schizoaffective and bipolar 2

15   disorders, R.W.'s treating providers all recognized a disability. The mere fact that their

16   assessment of his disabilities differed in some respects (*e.g.*, Dr. Anderson stated that R.W.'s

17   insight/judgment was impaired in 2020 but Dr. Friedman found otherwise in 2022) does not mean

18   that the record was ambiguous so as to mandate sua sponte a consultative examination. As several

19   courts have noted, "inconsistent evidence is not the same as ambiguous evidence." *Loaiza v.*

20   *Comm'r of Soc. Sec.*, No. 2:23-cv-01964-CKD, 2024 U.S. Dist. LEXIS 132536, at *9 (E.D. Cal.

21   July 25, 2024); *see also Torres v. Comm'r Soc. Sec.*, No. 2:19-CV-1246-DMC, 2020 U.S. Dist.

22   LEXIS 181273, at *19-20 (E.D. Cal. Sept. 30, 2020) (noting that an ALJ is asked with resolving

23   conflicting, or contradictory, evidence and that a conflict does not mean there is ambiguity for

24   purposes of triggering the duty to develop the record; ambiguous evidence is unclear evidence –

25   *e.g.*, where a doctor does not render a clear opinion).

26

27

28   _____
[2] And if that were the case, that would have meant recontacting the provider(s), not necessarily
ordering a consultative examination.

C.    Evaluation of Medical Opinions

R.W. argues that, even if the ALJ did not fail in her duty to develop the record, she committed a number of other errors that warrant a remand. R.W. focuses first on the ALJ's evaluation of the medical opinions in the record.

1.    Specialization of Provider

According to R.W., the ALJ improperly "disregarded" the opinions of two treating providers, Dr. Jennings and Mr. Pickett, Op. Br. at 24, on the basis that they are not mental health professionals but rather a primary care physician and PA, respectively. *See* AR 39 (ALJ decision). R.W. is correct that a primary care provider – though not a specialist – can still provide an opinion on a claimant's mental condition. *See Sprague v. Brown*, 812 F.2d 1226, 1232 (9th Cir. 1987) (stating that "Dr. Gehlen is qualified to give a medical opinion as to Mrs. Sprague's mental state as it relates to her physical disability even though Dr. Gehlen is not a psychiatrist," especially as "primary care physicians (those in family or general practice) 'identify and treat the majority of Americans' psychiatric disorders'"); *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) (noting that "Dr. Kho provided treatment for the claimant's psychiatric impairment, including the prescription of psychotropic medication" and thus "[h]is opinion constitutes 'competent psychiatric evidence' and may not be discredited on the ground that he is not a board certified psychiatrist"), *superseded by statute on other grounds as stated in Claudia Z. v. Kijakazi*, No. CV 20-10992-PLA, 2022 U.S. Dist. LEXIS 6485, at *7-8 (C.D. Cal. Jan. 12, 2022). But that does not mean that the ALJ erred in the case at bar. Under the Social Security regulations, the ALJ was allowed to take into account the providers' lack of specialization in evaluating their opinions. *See* 20 C.F.R. §§ 404.1520c(c)(4), 416.920c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."). More important, the ALJ did not reject Dr. Jennings and Mr. Pickett's opinions solely because they are not mental health professionals. Rather, what drove her analysis was the fact that the opinions of Dr. Jennings and Mr. Pickett were not fully supported

1    and/or were not consistent with other evidence in the record.  *See* AR 39-40 (ALJ decision).  *See*

2    *infra*.  Thus, even if the ALJ erred as R.W. claims, that was at most harmless error.

3                2.    <u>Supportability of Medical Opinions</u>

4         R.W. argues next that the ALJ erred in evaluating the medical opinions of record because

5    she failed to consider the "supportability" of *any* medical opinion, as to opposed to its

6    "consistency."  *See* Op. Br. at 22-23; *see also* 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2) ("The

7    factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this

8    section) are the most important factors we consider when we determine how persuasive we find a

9    medical source's medical opinions or prior administrative medical findings to be.").

10        The Social Security regulations address "supportability" and "consistency" as follows:

11            (1)    Supportability.  The more relevant the objective medical
12                   evidence and supporting explanations presented by a medical
                     source are to support his or her medical opinion(s) or prior
13                   administrative medical finding(s), the more persuasive the
                     medical opinions or prior administrative medical finding(s)
14                   will be.

15            (2)    Consistency.  The more consistent a medical opinion(s) or
16                   prior administrative medical finding(s) is with the evidence
                     from other medical sources and nonmedical sources in the
17                   claim, the more persuasive the medical opinion(s) or prior
                     administrative medical finding(s) will be.

18   *Id.* §§ 404.1520c(c); 416.920c(c).  As indicated by the text above, there is a distinction between

19   supportability and consistency.  *See also Woods v. Kijakazi*, 32 F.4th 785, 793 n.4 (9th Cir. 2022)

20   (taking note of the distinction).

21        R.W. is correct that, per the regulations, an ALJ is required to consider both supportability

22   and consistency in evaluating medical opinions.  Indeed, the regulations provide that, because

23   supportability and consistency are the most important factors, the agency "will *explain* how we

24   considered the supportability and consistency factors for a medical source's medical opinions or

25   prior administrative medical findings in your determination or decision."  20 C.F.R. §§

26   404.1520c(b)(2), 416.920c(b)(2) (emphasis added).  Hence, a failure to consider supportability

27   may provide a basis for reversal.

28   / / /

1    However, the ALJ did include supportability analysis in her decision.  Much of R.W.'s

2 argument hinges on his contention that, when a medical opinion is provided in a document, what

3 "support" that opinion has must be contained within the four corners of that document only.

4 Anything outside the four corners is considered as part of the consistency analysis, not the

5 supportability analysis.  But R.W. does not cite any authority to support this narrow view of

6 supportability.

7    Instead, supportability is ultimately focused on how a doctor reaches the medical opinion.

8 *See Charlot v. Bisignano*, No. 24-12610-MPK, 2025 U.S. Dist. LEXIS 167213, *25 (D. Mass.

9 Aug. 22, 2025) ("What is missing is any mention of *how* Dr. Feliz made these findings: his

10 examination of the record, his patient interview, and the physical examination he conducted.")

11 (emphasis in original).  Thus, *e.g.*, if a treating doctor renders a medical opinion in one document

12 but has considered earlier treatment notes in rendering that opinion, those earlier treatment notes

13 are part of the supportability of the medical opinion even if they are outside the four corners of the

14 document that contains the medical opinion.  *Cf. King v. Bisignano*, No. 24-4619, 2025 U.S. App.

15 LEXIS 17150, *2 (9th Cir. July 11, 2025) (stating that "[s]upportability refers to whether a

16 medical opinion is supported by the source's *own* medical evidence; consistency refers to whether

17 a medical opinion is consistent with evidence in the record provided by *other* sources") (emphasis

18 added); *see also Stein v. O'Malle*y, No. 23-16115, 2024 U.S. App. LEXIS 18784, at *2 (9th Cir.

19 Aug. July 30, 2024) (stating that "[s]ubstantial evidence supports the ALJ's conclusion that

20 Pence's sedation opinion is *not supported by her own treatment notes* and is inconsistent with

21 treatment notes from other providers") (emphasis added); *see also Black v. Comm'r of SSA*, No.

22 CV-23-08618-PCT-DLR, 2025 U.S. Dist. LEXIS 30169, at *9 (D. Ariz. Feb. 19, 2025) (stating

23 that "the supportability factor focuses on how the treating physician's notes support his *own*

24 assessment") (emphasis added).  *Accord Keyes v. O'Malley*, No. 24-61991-CV-GOODMAN, 2025

25 U.S. Dist. LEXIS 200697, *13 (S.D. Fla. July 7, 2025) (indicating that the supportability factor

26 has not been sufficiently addressed if the ALJ fails to explain *how* the doctor's own treatment and

27 examination notes do not support his opinions).

28 / / /

United States District Court
Northern District of California

With this understanding, it is clear that the ALJ did conduct a proper supportability analysis. For example, one of R.W.'s treating providers, Dr. Jennings, completed a mental capacity assessment in June 2021 in which he stated, *inter alia*, that R.W. had marked limitations with respect to the ability to set realistic goals based on his learning/developmental disability. *See* AR 773 (mental capacity assessment). However, this was inconsistent with Dr. Jennings's own medical notes which characterized the mental disability as mild. *See, e.g.*, AR 784 (medical records from Dr. Jennings, dated November 2021) (stating that R.W. had a mild cognitive impairment developmental disability). Similarly, in September 2023, Mr. Pickett filled out a mental impairment questionnaire in which he stated, *inter alia*, that R.W. had had either three or four or more episodes of decompensation within a twelve-month period, each of at least two weeks in duration. *See* AR 910 (mental impairment questionnaire). But Mr. Pickett's medical records did not suggest any such issues with mental condition, *see, e.g.*, AR 835, 839 (medical records from Mr. Pickett, dated March and June 2023) (describing psychiatric state as "[a]lert and interactive with normal affect" and not mentioning any episodes of decompensation), and Mr. Pickett even characterized the bipolar 2 disorder as stable. *See* AR 835, 839 (also noting reports by R.W. that his behavioral health was "stable" with no suicidal ideation and that "his mental health is well at this time"). *See generally* AR 39-40 (ALJ decision) (stating that "Dr. Jennings' own progress notes variously document observations of essentially unremarkable mental status"; also stating that Mr. Pickett's medical notes indicated R.W. was reporting doing well and that mental status examinations were unremarkable).

The ALJ also addressed the supportability of the state agency consultants' opinions. For instance, the ALJ noted that "Dr. Cremerius and Dr. Cools [the consultants who evaluated R.W.'s mental impairments] reviewed claims examiner findings of fact that included reporting that there was no medical evidence of record for any time period through the March 31, 2014 Title II date last insured." AR 37. This supported "Dr. Cremerius' administrative medical finding regarding insufficient evidence through the date last insured." AR 37. The ALJ also noted that the two consultants' administrative medical findings were partially supported by "some evidence of anxiety and depression as well as self-reporting of occasional auditory hallucinations and a history

16

1  of developmental/learning disorder, while also noting observations of intact attention and memory

2  and 'generally intact' cognitive functioning."  AR 37; *see also* AR 111 (Dr. Cremerius notes)

3  ("The records in file partially support the existence, intensity & persistence of the alleged mental

4  impairments.  Some record of mood disorder noted in the treating source documentation.

5  Cognitive functioning noted to be generally intact.  Claimant described as capable of performing a

6  variety of independent activities.  Overall, the record provide[s] some consistency and

7  supportability of the mental allegations.").

8          Accordingly, the Court rejects R.W.'s contention that the ALJ failed to conduct a

9  supportability analysis of any medical opinion.  The ALJ considered the supportability of medical

10  findings of both those which were supportive of as well as those adverse to his claims of

11  disability.

12          3.      Specificity of Analysis

13  R.W. next criticizes the ALJ for not providing sufficient specificity in her analysis:

> The ALJ: (1) does not identify the many specific instances where
> her findings differed from those of each medical source; (2) does not
> explain how she resolved each conflict; and (3) does not identify
> specific evidence supporting her finding and the specific evidence
> undercutting the medical source's found limitations.  At most, the
> ALJ states her assessment of the global opinions offered by a given
> medical source and then regurgitates parts of treatment notes untied
> to any of the many opinions offered by each medical source. . . . [A]
> mindless recitation of treatment notes not tied to specific found
> limitations simply does not satisfy requirements of specificity that
> must be satisfied by an ALJ.

20  Op. Br. at 24.

21          The Court is not persuaded.  As an initial matter, the Court notes that R.W.'s argument is

22  somewhat tied to now-superseded authority holding, *e.g.*, that an ALJ must provide specific and

23  legitimate reasons for rejecting a treating or examining doctor's opinion.  *See Woods*, 32 F.4th at

24  792 (noting that such authority is "incompatible with the revised [Social Security] regulations").

25  That authority is no longer controlling.

26          To be sure, under the now-applicable regulations, an ALJ cannot reject a treating (or even

27  examining) doctor's opinion "as unsupported or inconsistent without providing an explanation

28  supported by substantial evidence.  The agency must 'articulate . . . how persuasive' it finds 'all of

the medical opinions' from each doctor or other source and 'explain how [it] considered the supportability and consistency factors' in reaching these findings."  *Id.*; *see also* 20 C.F.R. §§ 404.1520c(b), 416.920c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record.").  But that simply means that an ALJ must provide sufficient reasoning such that a court can meaningfully review the ALJ's decision.  *See also Regina V. v. Bisignano*, No. 2:24-CV-01661-RAL, 2025 U.S. Dist. LEXIS 190476, *19 (W.D. Pa. Sept. 26, 2025) (stating that "the law imposes no obligation on an ALJ to provide the level of detail Plaintiff seeks here"; the "substantial evidence standard is deferential, requiring only that the ALJ's path of reasoning be traceable, not that it be exhaustively detailed"); *LaBona v. Kijakazi*, No. 5: 23-035-DCR, 2023 U.S. Dist. LEXIS 112293, *7-8 (E.D. Ky. June 29, 2023) (stating that an ALJ "'must adequately explain why he weighed the evidence as he did'" – so that a court can conduct a meaningful review – but the "explanation need  not be lengthy" and the ALJ does not need to explain his evaluation of each portion of a medical source's opinion); *Michael L.A. v. Kijakazi*, No. 2:20-04918 ADS, 2021 U.S. Dist. LEXIS 206701, *11 (C.D. Cal. Oct. 26, 2021) (explaining that an ALJ cannot conclusorily state that a medical opinion is not consistent with or supported by the medical record; rather, "[t]he ALJ is required to state in more detail *what* in the medical records conflicts with or is missing to support [a medical] opinion" so that there can be meaningful review) (emphasis added)[3].

Here, the ALJ met that standard in issuing her 29-page, single-spaced opinion.  As noted above, the ALJ addressed various medical opinions – for both physical and mental impairments – including those from Dr. Jennings, Dr. Anderson, Dr. Friedman, Mr. Pickett, Dr. Lewis, and state agency consultants.  And she provided specific and substantial evidence, *see Obrien v. Bisignano*, 142 F.4th at 693 (explaining that "[s]ubstantial evidence means only[] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted), in explaining why she found those opinions persuasive.

[3] *Accord Israel v. Astrue*, 494 Fed. Appx. 794, 797 (9th Cir. 2012) ("[T]he ALJ must consider all of the evidence, but need not comment specifically on each element of each piece of evidence.").

United States District Court
Northern District of California

1    For example, with respect to mental impairments, Dr. Anderson was a treating provider

2    who conducted a psychiatric evaluation in April 2020. *See* AR 674 (medical records from Dr.

3    Jennings, dated September 2019) (noting that referral was being made to Dr. Anderson for

4    "depression issues and mood swings"). Dr. Anderson noted, *inter alia*, that R.W. reported hearing

5    voices for the last three years, that R.W.'s thought process was "frequently illogical, and that R.W.

6    had impaired insight or judgment. *See* AR 654 (medical records from Dr. Anderson). Dr.

7    Anderson diagnosed R.W. with schizoaffective disorder and depression. *See* AR 655. He

8    prescribed Abilify/aripiprazole, recommended psychotherapy, and set a return visit for four weeks

9    later. *See* AR 655; *see also* AR 424 (Disability Report) (R.W. indicating that aripiprazole was

10    prescribed to address "aggression"). It appears that R.W. did not return for evaluation until

11    several months later. On the return visit in July 2020, Dr. Anderson again noted illogical thinking

12    as well as impaired insight or judgment. He also took note once again of R.W.'s reporting that he

13    occasionally heard voices, but "[n]o specific delusions are identified." AR 652. R.W. informed

14    Dr. Anderson that he "did not do well with Abilify" because it caused bad headaches and that he

15    was "doing fine" and was not depressed. AR 652. Dr. Anderson found that R.W. was "somewhat

16    improved" and decided not to prescribe any other medication but "offered the services of the clinic

17    in the future if needed." AR 652 (stating that a return visit was only "[a]s needed"). There is no

18    indication in the record that R.W. ever returned to Dr. Anderson or another psychiatric specialist

19    until Dr. Friedman in 2022.

20    In her decision, the ALJ implicitly recognized that Dr. Anderson's medical opinions had

21    some support given the mental evaluations he conducted. *See also* AR 23 (finding, at step two,

22    that among R.W.'s severe impairments were depressive disorder and schizoaffective disorder).

23    However, she also took into account that Dr. Anderson's own medical notes indicated

24    improvement. Furthermore, Dr. Anderson's assessments were not consistent with other medical

25    evidence in the record. For example, in examinations conducted by a nurse practitioner in October

26    and December 2020, there were no psychiatric symptoms or issues noted and R.W. even denied

27    stopping use of Abilify due to headaches. *See* AR 739, 782 (Ms. Marquette medical notes).

28    Although R.W. reported to a different provider, Dr. Friedman, in late 2022 that he sometimes

1    heard voices calling his name, *see* AR 854 (medical records from Dr. Friedman), Dr. Friedman

2    found no hallucinations and "[n]o delusional content expressed."  AR 855.  She also found R.W.'s

3    thought process linear and goal oriented and assessed his insight or judgment as fair.  *See* AR 855.

4    To the extent R.W. argues that Dr. Friedman's findings conflict with those of Dr. Jennings and

5    Mr. Pickett the ALJ was entitled under the regulations to find Dr. Friedman's opinions more

6    persuasive given her specialization.  Moreover, as indicated above, the ALJ fairly found that the

7    treatment notes of Dr. Jennings and Mr. Pickett could be viewed as not supporting their statements

8    that R.W. had severe or marked limitations.  *See, e.g.*, AR 791, 799 (medical notes from Dr.

9    Jennings, dated February and August 2021) (describing R.W. as alert and oriented with no acute

10   distress and with appropriate mood and affect); AR 836 (medical notes from Mr. Pickett, dated

11   June 2023) (stating that R.W.'s bipolar 2 disorder was stable).

12          For physical impairments, the ALJ properly took into account that R.W.'s main complaint

13   was related to back problems.  The record supported lumbar degenerative disc disease but, as the

14   ALJ noted, showed no more than mild to moderate abnormalities.  *See, e.g.*, AR 689 (lumbar spine

15   evaluation by Dr. Horn in June 2017) (noting "T11-L1 mild and L3-5 early degenerative disc

16   disease without acute osseous abnormality"); AR 750-51 (internal medicine evaluation by Dr.

17   Lewis in April 2021) (diagnosing lumbago but finding that R.W. could still "stand and walk up to

18   six hours" and "sit without limitations"; indicating normal range of motion in cervical and lumbar

19   spine); AR 863 (lumbar spine evaluation by Dr. Duge in May 2022) (finding "mild degenerative

20   disc disease at T11-L1 and L3-4"); AR 864 (lumbar spine evaluation by Dr. Duge in July 2022)

21   (finding mild to moderate central stenosis at L3-4 and mild central stenosis and mild bilateral

22   foraminal stenosis at L4-5; AR 838 (findings by Mr. Pickett in March 2023) (noting mild to

23   moderate central stenosis in L3-4 and mild central stenosis and mild bilateral foraminal stenosis in

24   L4-5).

25   / / /

26   / / /

27   / / /

28   / / /

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    D.    Evaluation of Credibility

2          R.W. contends that, putting aside the medical opinions, the ALJ further erred in her

3    assessment of his credibility.[4]

4              To determine whether a claimant's subjective symptom testimony is
             credible, the ALJ must engage in a two-step analysis: "First, the ALJ
5            must determine whether the claimant has presented objective
             medical evidence of an underlying impairment which could
6            reasonably be expected to produce the pain or other symptoms
             alleged."  In this analysis, the claimant is "not required to show that
7            [their] impairment could reasonably be expected to cause the
             severity of the symptom [they have] alleged; [they] need only show
8            that it could reasonably have caused some degree of the symptom."
             Further, the claimant is not required to produce "objective medical
9            evidence of the pain or fatigue itself, or the severity thereof."

10             "If the claimant satisfies the first step of this analysis, and there is no
             evidence of malingering, the ALJ can reject the claimant's testimony
11           about the severity of [their] symptoms only by offering specific,
             clear and convincing reasons for doing so."
12

13   *Ferguson v. O'Malley*, 95 F.4th 1194, 1199 (9th Cir. 2024).

14         The Ninth Circuit has noted that "'[t]he clear and convincing standard is the most

15   demanding required in Social Security cases.'"  *Id.*  Moreover, "'[a]n ALJ . . . may not discredit

16   the claimant's subjective complaints solely because the objective evidence fails to *fully*

17   *corroborate* the degree of pain alleged.'"  *Id.* at 1200 (emphasis added); *see also Smartt v.*

18   *Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).  In other words, "an ALJ cannot effectively render a

19   claimant's subjective symptom testimony superfluous by demanding positive objective medical

20   evidence 'fully corroborat[ing]' every allegation within the subjective testimony." *Id.*  But an ALJ

21   is not barred "from using inconsistent objective medical evidence in the record to discount

22   subjective symptom testimony. . . . When objective medical evidence in the record is inconsistent

23   with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such

24   testimony." *Id.*; *see also id.* at 499 (adding that, otherwise, a claimant's subjective evidence

25   would "effectively trump all other evidence in a case").  "Ultimately, the clear and convincing'

26   standard requires an ALJ to show his work." *Id.*

27   _____

28   [4] This issue essentially overlaps with R.W.'s contention that the ALJ erred at step three in
     evaluating his mental impairments.

1    Here, the ALJ provided clear and convincing reasons supported by substantial evidence to

2    support her credibility determination.  *See* AR 31 (ALJ decision) (finding that R.W.'s "medically

3    determinable impairments could reasonably be expected to cause the alleged symptoms," but his

4    "statements concerning the intensity, persistence and limiting effects of these symptoms are not

5    entirely consistent with the medical evidence and other evidence in the record").[5]  For example,

6    for R.W.'s mental impairments, the ALJ noted that mental status examinations largely contained

7    unremarkable findings.  *See, e.g.*, AR 836 (medical notes from Mr. Pickett, dated June 2023)

8    (indicating that R.W.'s bipolar 2 disorder was stable); AR 855 (medical notes from Dr. Friedman,

9    dated September 2022) (noting that R.W. had a linear, goal-oriented thought process, that no

10   delusional content was expressed, that R.W.'s memory and cognition was intact, and that his

11   judgment and insight were fair).  To the extent R.W. claimed a learning or developmental

12   disability, the ALJ  fairly took into account that did not prevent him from working at a pizza place

13   for 7 years and then a car rental company for 6 years.  *See* AR 654 (medical notes from Dr.

14   Anderson, dated April 2020).  Moreover, Dr. Jennings, one of R.W.'s main treating providers,

15   characterized the learning/developmental disability as mild in his records.  *See* AR 784 (medical

16   notes from Dr. Jennings in November 2021) (stating that R.W. had a mild cognitive impairment

17   developmental disability).  And as the ALJ also pointed out, R.W. engaged in activities that

18   suggested he could sustain attention, concentration, and adapt – including watching over a thrift

19   store during the night and early morning for a friend/helper, *see* AR 948-49 (hearing transcript)

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25

26   ────────────────────

27   [5] R.W. suggests that the ALJ should have been more specific than this.  *See* Op. Br. at 26
     (criticizing the ALJ for not citing to any specific testimony from R.W.).  But as indicated above,
     the law does not impose such a requirement.  Rather, the ALJ simply must have "shown her
28   work."

(testifying that, about four days a week, he watches over the store, from roughly 7:00 p.m. to 6:00 a.m.),[6] and driving. *See* AR 68 (hearing transcript).[7]  The ALJ also fairly noted that R.W. provided testimony indicating he stopped working in December 2012 (the alleged disability onset date) because the business where he was working closed, *see* AR 65 (hearing transcript), and further told a disability examiner in 2021 that he did not feel his mental health issues prevented him from working.  *See* AR 106 (note from disability examiner in May 2021) (also stating that R.W. said he could not find work because he is a registered sex offender); *see also* AR 711, 718 (notes from social worker in February 2018) (noting that R.W. stated unemployment was not due to his mental health condition but rather because of change in ownership at most recent job; also concluding "employment challenges NOT DUE TO MH CONDITION").[8]  The fact that there was some evidence supporting R.W's testimony regarding his limitations does not negate the fact that there was substantial evidence which provided clear and convincing reasons to discredit some of that testimony.

    To the extent R.W. challenges the ALJ's discounting of mental limitations because symptoms waxed and waned "secondary to the claimant's use of medication modalities or otherwise," AR 31 (ALJ decision), that is at most harmless error on the part of the ALJ given the

---

[6] In his papers, R.W. argues that his friend/helper was simply giving him a place to sleep several nights a week.  However, at the hearing, R.W. testified that his watching over the store included walking the perimeter as well as keeping an eye on things inside because there had been a break in previously.  *See* AR 948 (hearing transcript).  This evidence also refutes R.W.'s assertion that the ALJ did not ask or consider "how often he engages in any of [his] activities and never asked how long he spent doing any of these activities in any given instance."  Op. Br. at 20.

[7] At the second hearing before the ALJ, R.W. claimed that he stopped driving in 2016.  *See* AR 928 (hearing transcript).  But that conflicted with testimony he provided to the ALJ in 2022.  *See* AR 68 (hearing transcript) (stating that he drives twice in an average week).

[8] For similar reasons, the Court finds no error with respect to the ALJ's decision not to credit fully the statements provided by lay witnesses.  *See* AR 42 (ALJ decision); AR 635-36 (letters submitted by Laurie Hernandez and Mari Roth addressing mental limitations); *see also Ballard v. Bisignano*, No. 24-6560, 2025 U.S. App. LEXIS 29479, *7 (9th Cir. Nov. 10, 2025) (explaining that an ALJ must provide germane reasons for discounting lay testimony; adding that a failure to provide germane reasons "is harmless if 'the lay testimony described the same limitations as [the claimant's] own testimony, and the ALJ's reasons for rejecting [the claimant's] testimony apply with equal force to the lay testimony'").  The ALJ did not discount their testimony entirely in assessing R.W.'s RFC – limiting him to simple work with no more than occasional interaction with the general public, coworkers, and supervisors.  *See* AR 29 (ALJ decision).

1    other reasons supporting her credibility determination.  *See Carmickle v. Comm'r, SSA*, 533 F.3d

2    1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's

3    conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate

4    [credibility] conclusion,' such is deemed harmless and does not warrant reversal.").

5          Likewise, the ALJ provided clear and convincing reasons supported by substantial

6    evidence to find R.W. only partially credible as to physical disability.  As indicated above, there

7    was substantial medical evidence indicating that R.W.'s back problems were mild to moderate.

8    Although R.W. claimed that he needed to lay down 2-3 times a day, the ALJ properly took into

9    account that he never told his treating providers that this was a means he used to alleviate his

10   symptoms; moreover, there is no evidence that his treating providers recommended that practice.

11   *See* AR 36 (ALJ decision).  Furthermore, R.W. engaged in activities that indicated he could do

12   more than claimed, including riding his bike "daily" "all over town," AR 478 (medical notes from

13   Mr. Marquette in October 2020); AR 888 (medical notes from Ms. Casey in December 2020), and

14   helping keep the thrift store of his friend/helper secure during evening and early morning hours.

15   *Compare, e.g.*, *Jamie B. v. Bisignano*, No. 24-1948-DRM, 2025 U.S. Dist. LEXIS 137009, *11

16   (D. Md. July 18, 2025) (noting that "most of the activities accurately described by the ALJ are

17   *basic in nature*, with some requiring nothing more than a modicum of physical exertion (i.e.,

18   driving, going out alone, doing laundry, and preparing meals)'") (emphasis added); *cf. Orn v.

19   Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (stating that there are "*two* grounds for using daily

20   activities to form the basis of an adverse credibility determination": (1) when the activity

21   contradicts testimony provided by the claimant and (2) when the activity satisfies "the threshold

22   for transferable work skills") (emphasis added).

23         In sum, the ALJ cited clear and convincing reasons supported by substantial evidence

24   justifying her decision not to fully credit R.W.'s testimony regarding his limitations.

25   E.    Steps Four and Five

26         Finally, R.W. makes several arguments related to determinations that the ALJ made related

27   to steps four and five.  None has merit.

28

1          1.     Nonsevere Impairments

2          For example, R.W. contends that the ALJ failed to consider the nonsevere impairments in

3   making her RFC assessment.  But that is not correct.  The ALJ's decision clearly reflected her

4   consideration of the nonsevere impairments in conjunction with her RFC assessment – and that the

5   medical evidence indicated the impairments did not pose any concrete health risk and/or were

6   under control.  *See, e.g.*, AR 33 (ALJ decision) (noting that "cardiac stress testing . . . conducted in

7   late August of 2021 was largely unremarkable"); AR 40 (stating that in spite of "some evidence of

8   mild recurring obesity, and isolated reporting of mildly reduced oxygen saturation, the claimant

9   otherwise generally denied respiratory problems and presented with largely unremarkable

10  respiratory and cardiovascular exam findings over his medical history"); AR 41 (stating that "there

11  is no evidence of diabetic retinopathy, and while the claimant was diagnosed with bilateral

12  cataracts, he was consistently noted as functioning well with regard to vision (with related

13  reporting that any cataract surgery would be deferred), and his clinicians more particularly

14  observed adequate visual acuity and full visual fields").

15         2.     Seven Strength Demands

16         R.W. also criticizes the ALJ for not conducting a function-by-function assessment of each

17  of the seven strength demands before determining his physical RFC.  *See* Op. Br. at 29.

18              Social Security Ruling 96-8p ("SSR 96-8p") prescribes the rules an
                ALJ must follow when making an RFC assessment.  SSR 96-8p,
19              explains that the RFC is a "function-by-function assessment" of an
                individual's ability to do work-related activities.  This function-by-
20              function assessment must occur **before** the RFC may be expressed
                in terms of the exertional levels of work (e.g., light, medium,
21              heavy).

22              To carry out the function-by-function assessment, the ALJ must
                assess "the individual's remaining abilities to perform each of seven
23              strength demands: [s]itting, standing, walking, lifting, carrying,
                pushing, and pulling."  The ruling also specifically requires that
24              "[e]ach function must be considered separately (e.g., 'the individual
                can walk for 5 out of 8 hours and stand for 6 out of 8 hours'), even if
25              the final RFC assessment will combine activities."  SSR 96-8p
                explains that "it is necessary to assess the individual[']s capacity to
26              perform each of these functions in order to decide which exertional
                level is appropriate and whether the individual is capable of doing
27              the full range of work contemplated by the exertional level."  "The
                RFC assessment must include a narrative discussion describing how
28              the evidence supports  each conclusion . . . and describe the

United States District Court
Northern District of California

25

maximum amount of each work-related activity the individual can perform based on the evidence available."

*Massey v. Saul*, No. No. 1:20-cv-00201-CMA, 2021 U.S. Dist. LEXIS 59262, at *6-8 (D. Colo. Mar. 29, 2021).

R.W.'s argument is flawed for several reasons.  First, to the extent he suggests that the ALJ was required to explicitly address each of the seven strength demands in her written decision, that is incorrect.  *See Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-48 (6th Cir. 2002) ("'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing.'"); *Simmons v. Saul*, No. 18-cv-1293 (JDB/GMH), 2019 U.S. Dist. LEXIS 238124, at *44 (D.D.C. Sept. 30, 2019) ("To the extent that Plaintiff argues that the absence of explicit and separate evaluations of each of the relevant strength categories in itself requires remand (or reversal), he is mistaken. . . . SSR 96-8p 'does not provide the specific mandate' that an ALJ 'must undertake a specific discussion of each of the seven functions'; rather the ruling requires only 'consideration of all the factors, not enumeration of all the factors.'"); *see also Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) ("Although the RFC assessment is a function-by-function assessment, . . . the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient.").

Second, an ALJ is not required to address a strength demand if the claimant is not asserting a physical limitation related to that strength demand.  *See* SSR 96-8p (stating that, "when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity").  Here, R.W. did not clearly assert to the ALJ that he had limitations with *all* of the seven strength demands (*e.g.*, pushing and pulling).  *See Rodriguez v. Comm'r of SSA*, No. 7:06-CV-151-BH, 2008 U.S. Dist. LEXIS 35376, *32 (N.D. Tex. Apr. 29, 2008) (noting that, "[a]lthough the ALJ only explicitly assessed two of the seven strength demands (lifting and carrying) specified in SSR 96-8p, there is no evidence in the medical record that Plaintiff possessed a restricted ability to sit, stand, walk, push, or pull").

Third, based on the record, it can fairly be inferred that the ALJ did consider the relevant strength demands. The ALJ's decision referenced, *e.g.*, R.W.'s testimony about standing, sitting, walking, and carrying/lifting. *See* AR 30 (ALJ decision); *cf. Depover v. Barnhart*, 349 F.3d 563, 567-68 (8th Cir. 2003) (finding that the ALJ did not err in failing to make explicit findings as to the claimant's ability to sit, stand, or walk when it was clear the ALJ did not overlook these abilities based on the hearing transcript and the written opinion).

Finally, for purposes of judicial review, R.W. has not identified what limitations the ALJ failed to consider to the extent she failed to address any strength demand. *See, e.g.*, *Weisbrot v. SSA*, No. 3:15-cv-00581, 2016 U.S. Dist. LEXIS 134841, at *14 (M.D. Tenn. Sept. 27, 2016) ("Plaintiff has failed to identify any particular evidence supporting an impairment of physical function which was not considered."); *Patterson v. Colvin*, No. 13-cv-1040-JDB-tmp, 2016 U.S. Dist. LEXIS 181599, *31 (W.D. Tenn. Dec. 16, 2016) ("Patterson does not make any specific arguments about how the ALJ's failure to explicitly discuss any of the individual exertional activities adversely affected the determination of her RFC."). Thus, any error by the ALJ was harmless. *See Rodriguez*, 2008 U.S. Dist. LEXIS 35376, at *33 ("Even assuming, arguendo, that the ALJ erred in her application of SSR 96-8p, Plaintiff has not affirmatively demonstrated ensuant prejudice from the procedural error."); *see also Khan v. Comm'r of Soc. Sec.*, No. CIV S-07-0290-CMK, 2008 U.S. Dist. LEXIS 53121, at *28 (E.D. Cal. July 3, 2008) ("[P]laintiff's argument puts form over substance. Specifically, the court finds that, even if the ALJ had made explicit findings as to each strength demand, no reasonable ALJ, when viewing the uncontested medical evidence as a whole, would reach a different conclusion as to plaintiff's residual functional capacity.").

### 3. Vocational Expert Testimony

Finally, R.W. faults the ALJ for accepting the vocational expert's conclusion that the job of auto detailer was equivalent to R.W.'s past relevant work as an RV detailer. According to R.W., "there is a significant difference between cleaning a car and cleaning [a] 45-foot motorhome; cars do not have refrigerators, stoves, ovens, televisions, showers, toilets, beds, etc." and, "[i]n many respects, someone detailing the inside of the motorhome is performing work much

United States District Court
Northern District of California

more like that performed by a housekeeper." Op. Br. at 30.  But even if there was an error by the ALJ here, it was harmless.  The ALJ found that R.W. could do medium duty work.  Even if R.W.'s past relevant work was not comparable to an auto detailer and he could not do his past relevant work, either as generally performed or actually performed (step four), the ALJ found there were other jobs in the national economy that he could still perform, both medium and light duty work (step five).  *See* AR 44-45 (ALJ decision) (identifying light exertional and medium exertional jobs).

### III.    CONCLUSION

For the foregoing reasons, the Court denies R.W.'s motion for relief.  The Court directs the Clerk of the Court to enter a final judgment in favor of the Commissioner and close the file in the case.


**IT IS SO ORDERED**.


Dated: December 3, 2025



_____
EDWARD M. CHEN
United States District Judge